**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HOWARD TERRELL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-4141 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Howard Terrell (" Terrell") and Defendant Michael

J. Astrue, Commissioner of the Social Security Administration (" Commissioner"),[1] cross-motions

for summary judgment. Terrell appeals the determination of an Administrative Law Judge (" the

ALJ") that he is not entitled to receive Title II disability insurance benefits.  *See* 42 U.S.C. §§

416(i), 423.  Having reviewed the pending motions, the submissions of the parties, the pleadings,

the administrative record, and the applicable law, this Court is of the opinion that Terrell' s

Motion for Summary Judgment (Docket Entry No. 19) should be granted, the Commissioner' s

Motion for Summary Judgment (Docket Entry No. 21) should be denied, and the ALJ' s decision

denying disability income benefits be reversed, and the case be remanded, pursuant to sentence

four, to the Social Security Administration (" SSA") for further proceedings.

---

[1]  Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.  Pursuant
to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted
for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner)
as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.       *Background*

Terrell filed an application for disability insurance benefits with the Social Security Administration (" SSA") on January 14, 2004, alleging disability beginning on March 31, 1989, as a result of cancer (non-Hodgkins lymphoma) and diabetes.[2] (R. 14, 58-60).  After being denied benefits initially and on the reconsideration levels (R. 44-46), on July 1, 2004, Terrell requested an administrative hearing before an ALJ to review the decision.  (R. 48-49).

A hearing was held on May 11, 2005, in College Station, Texas, at which time the ALJ heard testimony from Terrell and Robert D. Cox (" Cox"), a vocational expert (" VE").  (R. 22-36).  In a decision dated July 13, 2005, the ALJ denied Terrell' s application for benefits.  (R. 14-18).  On August 26, 2005, Terrell appealed the ALJ' s decision to the Appeals Council of the SSA' s Office of Hearings and Appeals.  (R. 8-10).  The Appeals Council, on October 6, 2005, denied Terrell' s request to review the ALJ' s determination.  (R. 4-6).  This rendered the ALJ' s opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Terrell filed this case on December 8, 2005, seeking judicial review of the Commissioner' s denial of his claim of benefits.  *See* Docket Entry No. 1.

---

[2] The ALJ's decision cites cancer (non-Hodgkins lymphoma) and diabetes.  (R. 17).  Terrell cites the following conditions when alleging disability: diabetes, exposure to Agent Orange, hypertension, diabetic peripheral neuropathy of all extremities but severe in the right upper; coronary artery disease status post myocardial infarction times three, tinnitus (R. 685).  *See* Docket Entry No. 20.  These disorders are confirmed by Terrell's physicians in the administrative record.  (R. 178, 183-185, 191, 291).

II.    *Analysis*

A.    *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Terrell was insured for benefits through December 31, 1994.  (R. 17, 61-62).  Consequently, to be eligible for disability benefits, Terrell must prove that he was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove " disability" within the meaning of the Act.  See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Under Title II, disability is defined as " the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

B.    *Standard of Review*

1.    *Summary Judgment*

The court may grant summary judgment under Fed. R. Civ. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material

3

fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Hell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

**2.    *Administrative Determination***

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere

scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court " scrutinize[s] the

record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th

Cir. 2001) (citations omitted).  If the Commissioner' s findings are supported by substantial

evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215

(5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible

evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698,

704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*,

or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In

short, " [c]onflicts in the evidence are for the Commissioner and not the courts to resolve.  *See

id*.

C.    ***ALJ' s Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant

is capable of performing " substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 404.1520(b).

2.    An individual who does not have a " severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.    An individual who " meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of " not disabled" must be made.  *See* 20 C.F.R. § 404.1520(e).

5

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.   *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.   The claimant has the burden to prove disability under the first four steps.   *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.   *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).   If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested.   *See Boyd*, 239 F.3d at 705.   A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.   *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).   An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act.   *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).   A claimant is deemed disabled under the Act only if he demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

6

to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  " [A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan v. Shalala*, 38 F.3d 232, at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.     The claimant met the special earnings requirements of the Social Security Act on March 31, 1989, the date he stated he became disabled, and continued to meet them through December 31, 1994.

2.     The claimant has not engaged in substantial gainful work since the alleged onset date of disability.

3.     On and prior to December 31, 1994, the claimant did not have a severe medically determinable impairment.

7

4.      The claimant's testimony was not fully credible or consistent with the record considered as a whole as it pertains to the period of time on and prior to December 31, 1994.

5.      On and prior to December 31, 1994, the claimant could have lifted 10 pounds frequently and 20 pounds occasionally, stood and walked 6 hours of an 8 hour workday, and sat for 6 hours of a workday.

6.      The claimant's past relevant work as a custodian was medium and unskilled.

(R. 17).  As to the fifth step, the ALJ concluded:

7.      As of December 1994 the claimant was 51 years of age, defined as an individual closely approaching advanced age.

8.      The claimant has a high school education.

9.      On and prior to December 31, 1994, the claimant's medical-vocational profile corresponded with Rule 202.13, Appendix 2, Subpart P, Regulations No. 4, which directs a conclusion of "not disabled," and administrative notice is taken of the fact that jobs that the claimant was capable of performing existed in significant numbers in the national economy.

10.     The claimant was not under a "disability," as defined in the Social Security Acct, as of or prior to December 31, 1994.

(R. 17).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Terrell's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's

8

subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).   Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Terrell*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.   *Issues Presented*

Terrell claims the ALJ's decision is not supported by substantial evidence.  Specifically, Terrell argues the ALJ failed to apply the proper legal standard in rejecting the opinions of his physicians; failed to provide a rationale with specific references to evidence of record in support of the assessed limitations; and failed to consider all factors when assessing his credibility. *See* Docket Entry No. 20.  The Commissioner disagrees with Terrell's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 22.

### E.   *Review of the ALJ's Decision*

#### 1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without

regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings

equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 404.1526(a).  The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)     You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)     You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)     We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993)

In the case at bar, the medical record is extensive with more than five hundred pages documenting Terrell's medical condition from 1997 until 2005.  (R. 101-684).  Medical evidence prior to November 1997 does not exist except for Terrell's personal accounts of a myocardial infarction in 1991 (R. 389-390, 583, 685) and his testimony during the administrative hearing of his on-the-job injuries which occurred in May 1987.  (R. 27-32, 186).  During the administrative hearing, Terrell testified to injuring his back and right arm while working at Texas A&M

University in 1987.  (R. 27).  His right arm required surgery; following the surgery, he was only able to lift 25 pounds occasionally and stand for 6 hours in an 8-hour workday.  (R. 27-28).  For Terrell's back, his doctor recommended surgery.  (R. 28-29).  Because his doctor was unable to guarantee any improvement, Terrell opted to take medications to alleviate his back pain.  (R. 28-29).

Furthermore, during the administrative hearing, Terrell testified to his health problems resulting from his military service, including his exposure to Agent Orange.  (R. 30).  In 1997, Terrell experienced tingling in his fingers, which limited the use of his fingers.  (R. 30-31).  He could pick up small objects such as needles or pins, but he was unable to grip the objects.  (R. 31).  With larger objects, such as a wrench, Terrell was able to momentarily grip the item until he would lose control of the object.  (R. 31).  He was unable to recall if his symptoms began prior to 1994.  (R. 30).

Terrell's medical records indicate that he completed two spinal lumbosocral procedures on November 6, 1997.  (R. 683-684).  Karen J. Stewart, M.D. ("Dr. Stewart") determined that there was minimal facet joint osteoarthritis at the L5-S1 level.  (R. 683).  There was spondylosis at all cervical disc levels except the C2-C3 and C5-C6 level.  (R. 684).  The facet joint osteoarthritis was most severe at the C4-C5 level.  (R. 684).  The neural foramina were narrowed by marginal spurs at C3-C4, C4,C5, and C6-7 levels.  (R. 684).

On February 17, 1998, Terrell completed a cardiac perfusion exercise and Linda Lauver, M.D. ("Dr. Lauver") interpreted the findings.  (R. 679).  Dr. Lauver concluded that there was widespread scarring in the basilar, mid and distal inferior inferolateral regions, the mid and distal

lateral wall and anterolateral area of the heart.  (R. 679).  Dr. Lauver determined there was no identifiable reversible ischemia.  (R. 679).

On March 9, 1998, Terrell completed a MRI of the cervical spine, with and without contrast.  (R. 676-677).  Terrell's clinical history was neural foramina narrowing with UE parathoia.  (R. 677).  From the exam and by comparing it with his prior exam on November 6, 1997, Theodore Hopens, M.D. ("Dr. Hopens") determined that at C3-4 there was moderate central spinal stenosis[3] with possible slight flattening of the cord and bilateral mild to moderate foraminal stenosis[4] present.  (R. 677).  Additionally, at C4-5 there was mild to moderate spinal stenosis and at C6-7 there was moderate degenerative joint disease with a questionable small right disc herniation.  (R. 677).

Terrell was examined by Parikshit P. Pandya, M.D. ("Dr. Pandya"), on September 8, 1998,  before his percutaneous nephrolithotomy surgery for kidney stones.  (R. 449-450).  Dr. Pandya documented Terrell's past medical history.  (R. 449).  Terrell had a previous myocardial infarction and his persantine thallium scan revealed widespread scarring.  (R. 449).  Terrell's echocardiogram revealed an ejection fraction of approximately 50%.  (R. 449).  Dr. Pandya noted chronic back pain, spondylosis of the spine; an MRI of Terrell's neck revealed spinal stenosis and mild-to-moderate foraminal stenosis.  (R. 449).  Terrell also had hypercholesterolemia and a previous gunshot wound.  (R. 449).  Terrell's medications, at that time, were beclomethasone

---

[3] "Spinal Stenosis" is narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1698 (29th ed. 2000).

[4] "Foraminal Stenosis" is an abnormal narrowing of a natural opening or passage. *See* DORLAND'S, *supra*, at 696, 1698.

inhaler, nitroglycerin 0.4 mg sublingual p.r.n., nitroglycerin patch 0.4 mg. per hour, and Mylanta p.r.n.  (R. 449).

On October 9, 1998, Harry H. Ko, M.D. ("Dr. Ko") interpreted Terrell's CT lumbar spine without contrast.  (R. 670).  Dr. Ko determined that Terrell had mild foraminal stenosis bilaterally at L4-L5 by bulging disc and osteophytosis.  (R. 670).

At the Cardiology Clinic at Temple Veterans Affairs Medical Center, Terrell was examined by Guruswami Ganesan, M.D. ("Dr. Ganesan") on January 6, 1999.  (R. 503-504).  Dr. Ganesan determined, through a review of past medical records, that Terrell suffered from angina in February 1998.  (R. 503).  Terrell's 2-D echocardiogram indicated inferior wall and septal hypokineis and his electrocardiograms showed inferior wall ischemia and occasional ventricular extrasystole but normal sinus rhythm.  (R. 503).  Terrell's chest x-ray showed borderline cardiac silhouette and his ejection fraction was 50%.  (R. 503).  Dr. Ganesan, after assessing Terrell's cardiovascular condition, documented the following:

> The veteran had angina of recent onset about one year ago.  From the studies of 2-D echo Doppler and myocardial perfusion done during his hospitalization, he must have had an old inferior wall infarction, and it is almost one year and to risk of surgical procedure n a patient like this is almost the same as a person without coronary artery disease at this time; however, there is no risk of reversible ischemia and his ejection fraction is 50%.

(R. 504).  Dr. Ganesan approved Terrell for his kidney stone surgery.  (R. 504).

On March 12, 1999, Terrell was examined by Daniel Lowery, M.D. ("Dr. Lowery") at the Pulmonary Clinic for his sleep apnea condition.  (R. 432-434).  A past medical history was completed and Dr. Lowery noted ischemic heart disease status post myocardial infarction in 1997, hyperlipidemia, severe compression of the cervical spine, chronic back pain, and a right kidney

stone, in which surgery had to be aborted.  (R. 433).  Terrell's current medications included

Mylanta double strength, Aspirin 325 mg., methyl salicylate menthol topical ointment,

nitroglycerin 0.4 mg sublingual, nitroglycerin patch, Tramadol 50 mg four times daily, and

Ibuprofen 800 mg three times daily.  (R. 433).

On November 29, 1999, Terrell completed a cervical spine without contrast MRI

procedure.  (R. 667-668).  Rajnikant S. Shah, M.D. (" Dr. Shah") interpreted the MRI and

opined that from the C2-C3 through C6-7 there was varying degrees of central stenosis due to

posterior degenerative vertebral end plate spurring.  (R. 667).  At C3-4, C4-5 and C6-7,

effacement of anterior subarachnoid space was noted on an axial study.  (R. 667).  The sagittal

images indicated posterior thickening of ligamentum flavum at the same levels.  (R. 667-668).

Dr. Shah opined that the central stenosis appeared at least moderate at C3-4 with mild flattening

of spinal cord anteriorly.  (R. 668).  At other levels, there was no definite flattening of the spinal

cord visualized.  (R. 668).  There was moderate narrowing of left C3-4 neural foramen and the

C4-5 neural foramina and moderate to severe narrowing of the right C6-7 neural foramen by

posterolateral spurring. (R. 668).

On October 29, 2002, Rajendra Motaparthi, M.D. (" Dr. Motaparthi") reviewed Terrell's

past medical history to determine whether Terrell's heart condition was secondary to diabetes

mellitus for compensation and pension purposes.  (R. 586).  Terrell had suffered diabetes mellitus

for the past six to seven years.  (R. 586).  As a Vietnam combat veteran in 1967 and 1969, Terrell

notified Dr. Motaparthi that his diabetes mellitus was related to Agent Orange exposure.  (R.

586).  Dr. Motaparthi noted Terrell's limited walking capability because of severe lower back

pain and observed that he walked with a cane.  (R. 586).  Due to his inability to walk, Dr.

Motaparthi was unable to complete the exercise tolerance examinations to assess his heart condition. (R. 587).  After reviewing Terrell's chest x-ray, electrocardiogram, echocardiogram, and blood sugar levels, Dr. Motaparthi diagnosed Terrell with artherosclerotic heart disease with stable angina, essential hypertension, and hyperlipidemia.  (R. 589).  He also concluded that Terrell had "diabetes mellitus that may be related to Agent Orange exposure while he was in the Vietnam era." (R. 589).  According to Dr. Motaparthi, "it is less likely than not that the heart condition is related to diabetes mellitus since he claimed he had heart disease before the diagnosis of diabetes mellitus." (R. 589).

During the period from 2003 to 2005, physicians diagnosed Terrell with the following conditions: degenerative joint disease, spasmodic torticollis, diabetes mellitus, hypertension, proteinuria, spinal stenosis of lumbar region, hyperlipidemia, coronary artery disease, elevated liver enzymes, myocardial infarction, kidney stone, acute bronchitis, vertigo, and sleep apnea. (R. 178, 183-185, 191, 291).  The record indicates extensive notes, in some cases entered monthly, during this period by Terrell's physicians.  (R. 178, 183-185, 191, 291).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory

16

findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Terrell*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, the ALJ failed to apply the proper legal standard when assessing Terrell's onset date of disability. A disability must exist prior to the date of last insured; hence the onset date of disability must be ascertained. *See Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir.), *cert. denied*, 444 U.S. 952 (1979). Pursuant to § 423, the date of last insured is determined by the disability insured status definition, which is satisfied by the claimant's earnings record. *See* 42 U.S.C. § 423(c)(1). The statute defines insured status to include a claimant who has worked 20 quarters of coverage during the 40-quarter period which ends with the quarter in which such month occurred. *See* 42 U.S.C. § 423(c)(1)(B)(i); *see also Demandre*, 591 F.2d at 1090. The definition, commonly referred to as the "20/40 requirement," essentially requires a

claimant to have worked five years out of the last 10 years.  *See id.*; *see also* POMS §§ RS 00301.120—301.148, available at http://policy.ssa.gov/poms.nsf/lnx.[5]

With a date of last insured established, a claimant is eligible for social security benefits if the onset of the medical impairment is on or before the date of last insured.  *See Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990); *see also Golofski v. Califano*, 607 F.2d 1063, 1066 (3d Cir. 1979).  To determine the onset date, the decision maker can consider the claimant's allegations, work history, medical and other evidence concerning impairment severity.  *See* 20 C.F.R. §§ 404.1505, 404.1508, 404.1527; *see also* Social Security Ruling 83-20, 1983 WL 31249, reprinted in *West's Social Security Reporting Service Rulings* 1983-1991 ("SSR 83-20"), at 2-4; *Ivy*, 898 F.2d at 1048.

In recognizing that the definition of "medical evidence" is not restricted to contemporaneous medical documents, the production of precise medical records is not a requisite to determine a disability onset date.  *See Ivy*, 898 F.2d at 1048-49 (citing *Parsons v. Heckler*, 739 F.2d 1334 (8th Cir. 1984)).  Therefore, it is possible, based on medical and other evidence describing the history and symptomatology, to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination.  *See* 20 C.F.R. §§ 404.1505, 404.1508, 404.1527; *see also* SSR 83-20, 1983 WL 31249, at 2-4; *Ivy*, 898 F.2d at 1048-49.  If, based on the record, reasonable inferences cannot be made, information may be obtained from family members, friends, and former employers to provide additional

---

[5] "POMS" refers to the SSA's handbook entitled Program Operations Manual Systems ("POMS").  Although the POMS may provide useful insights, it has no legal force and does not bind the courts.  *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981).  As a handbook representing internal policy, the POMS simply informs the courts of present operating procedures of SSA employees.

evidence of the applicant's condition and to ascertain why no medical evidence is not available. *See id.*  Moreover, when determining if an onset date is prior to the date of last insured, non-contemporaneous medical documents are relevant " because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." *See Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984); *Parsons*, 739 F.2d at 1340.

Upon reviewing Terrell's Insured Status Report (R. 61-62), Terrell's date of last insured was December 31, 1994.  *See* 42 U.S.C. § 423(B)(i).  Therefore, in order to obtain benefits, Terrell had to demonstrate that he was " disabled" on or before December 31, 1994.  *See Demandre*, 591 F.2d at 1090.  In this case, without a proper development of the record, the ALJ determined that Terrell was not disabled prior to December 31, 1994, finding that there were no medical documents available prior to December 31, 1994—*i.e.*, the date of last insured.  (R. 15-17).  While it is undisputed that the administrative record did not contain medical documents dated prior to December 31, 1994, the voluminous existing records present a reasonable inference that the onset date of Terrell's current disabilities could, at a minimum, be prior to his earliest medical record, which was in November 1997.

There is limited uncertainty that Terrell is currently disabled.  During the administrative hearing, the ALJ stated, " there's no doubt you're disabled right now and couldn't work." (R. 35).  Furthermore, Terrell, who was deemed unemployable by the Department of Veterans Affairs (" VA"), receives benefits due to exposure to Agent Orange, hypertension, diabetic peripheral neuropathy of all extremities but severe in the right upper, coronary artery disease status post

myocardial infarction times three, an eye condition, bilateral hearing loss, and tinnitus rated 100%.[6]  (R. 685).

Statements by Terrell and, arguably, the ALJ during the administrative hearing as well as Terrell's VA records make it unclear when Terrell's impairments became disabling and do not establish whether they were disabling prior to December 31, 1994.  Indeed, the onset date for Terrell's current disabilities, speculated to be caused by Agent Orange[7] exposure in Vietnam,[8] should have been evaluated and considered by a medical expert.  No medical expert was present at the administrative hearing.

Additionally, the administrative record contains ten years of treatment notes/records for Terrell's back pain, which Terrell believes originated with an on-the-job injury in 1987.  (R. 27-

_____

[6]  "A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citing *Loza*, 219 F.3d at 394.

[7]  "Agent Orange" is an herbicide and defoliant, consisting of (2,4,5-trichlorophenoxy) acetic acid, (2,4-dichlorophenoxy) acetic acid, and dioxin, that was widely used in the Vietnam War; it has been shown to possess residual post-exposure carcinogenic and teratogenic properties in humans. *See* STEDMAN'S MEDICAL DICTIONARY 35 (27th ed. 2000).

[8]  The following conditions have been recognized as military service connected for the treatment of veterans who were exposed to herbicide agents, including Agent Orange, during military service: (1) Chloracne or other acne form disease consistent with chloracne; (2) Non-Hodgkin's lymphoma; (3) Soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma); (4) Hodgkin's disease; (5) Porphyria Cutanea Tarda (PCT); (6) Respiratory cancers (cancers of the lung, larynx, trachea, and bronchus); (7) Multiple myeloma; (8) Prostate cancer; (9) Peripheral neuropathy, transient acute and sub-acute (i.e., transient peripheral neuropathy that appears within weeks or months of exposure and resolves within 2 years of date of onset); (10) Type 2 diabetes; and (11) Chronic lymphocytic leukemia.  *See* Agent Orange Overview, *available at* http://www1.va.gov/agentorange/ (follow "Agent Orange General Information Brochure - July 2003" hyperlink); Agent Orange Health Registry (Aor) Program Procedures To Include All Veterans Exposed to Agent Orange And Special Health Care Benefits for Vietnam Veterans' Children, *available at* http://www1.va.gov/agentorange/docs/AOHANDBOOK13022006.pdf.

30).  The ALJ failed to consider the relevant evidence in determining Terrell's onset date for his back injury and the severity of the impairment.  Considering the administrative record contains several MRI and CT scans of Terrell's back abnormalities beginning in 1998, and the existing medical evidence concerning Terrell's current disabilities, the ALJ should have considered and allowed for further development of the record to determine the onset date of his disabilities and the extent of the impairment.  (R. 676-677, 683-684).

As set forth above, Terrell's medical record was ambiguous, did not clearly document the progression of his impairments, and presented a situation where the ALJ needed to infer an onset date for Terrell's impairments.  Because of the ambiguity relating to the establishment of Terrell's onset date, the ALJ had a duty to develop a full and fair record, including calling upon a medical expert.  *See* SSR 83-20, 1983 WL 31249, at 2-4; *see also Blea v. Barnhart*, 466 F.3d 903, 911-12 (10th Cir. 2006) (ALJ's decision contradicted the clear dictates of SSR 83-20; case remanded to determine onset date of claimant's impairments with the assistance of a medical advisor); *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991) (" In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to made the determination."); *but see McClanahan v. Commissioner of Soc. Sec.*, 193 Fed. Appx. 422, 427-28 (6th Cir. 2006) (claimant's medical record was well-developed and carefully reviewed by the ALJ; thus, ALJ could determine onset date without need of medical expert); *Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006) (ALJ did not err in failing to obtain an expert opinion as the evidence was unambiguous as to the onset date); *Nix v. Barnhart*, 160 Fed. Appx. 393, 397 (5th Cir. 2005) (the ALJ determined that

21

claimant was not disabled; therefore, no inquiry into an onset date was required).  Therefore, this case must be remanded for a new hearing, at which time the ALJ should be instructed to follow the provisions of SSR 83-20, attempt to develop the record for the relevant time period, and call upon the assistance of a medical advisor.  *See* SSR 83-20, 1983 WL 31249, at 2-4.

### 2.  *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).   When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).   Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss*, 269 F.3d at 522; *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.   The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective  medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

22

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Terrell v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

In the case at bar, the ALJ found that Terrell's testimony was not credible and, while repeatedly stating in the opinion that "there was no evidence in the record," the ALJ ruled Terrell's testimony was inconsistent with the record as a whole.  (R. 15-17).  As set forth above, the ALJ improperly applied the legal standard by failing to consider all relevant evidence prior to December 31, 1994, when determining Terrell's onset date and the severity of his impairment. *See* 20 C.F.R. §§ 404.1505, 404.1508, 404.1527; *see also* SSR 83-20, 1983 WL 31249, at 2-4; *Ivy*, 898 F.2d at 1048-49.  Based on the illogical evaluation of the claimant's testimony and the

23

relevant evidence afforded by the law, the ALJ's determination that Terrell's testimony is not credible is not supported by substantial evidence.

3. ***Residual Functional Capacity***

Under the Act, a person is considered disabled:

> only if his physical or mental impairment or impairments are of such severity that his is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for his, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Terrell v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or

others of any limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.  When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings—*i.e.*, SSRs.  *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance.  *See id.*  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity.  *See id.*  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .  RFC involves both exertional and non-exertional factors.  Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In this case, the ALJ determined, based on the VE's testimony and Grid Rule 202.13, that Terrell was "not disabled" and he was able to perform light work.  (R. 17).  The ALJ concluded Terrell's medical-vocational profile corresponded with Rule 202.13, Appendix 2, Subpart P, Regulations No. 4, indicating that Terrell, a high school graduate with previous unskilled work experience, was capable of performing existing jobs in the national economy.  (R. 17).  Upon review of the administrative hearing, however, the ALJ's findings are unsupported by the VE's testimony—the entirety of which is set forth below:

Q:      Mr. Cox, you've had a chance to review the file here we said.  Correct?

A:      Yes.

Q:      Any other questions you need answered, information you need before you can give your opinion as a vocational expert?

A:      No, thank you.

Q:      Okay.  Can you categorize then this last job we've discussed?  And if your testimony varies from the Dictionary of Occupational Titles, please say so as you go along.

A:      All right.  Custodian is classified as unskilled, medium work.

Q:      And obviously there are no transferable skills, right?

A:      Yes, that's right.

(R. 34-35).   Despite the absence of medical records prior to December 31, 1994, the ALJ inexplicably found Terrell's physical capabilities, prior to December 31, 1994, were limited to lifting no more than 20 pounds frequently and standing and walking for a total of 6 hours in an 8-hour workday. These limitations, however, were not presented to the VE in a hypothetical question.  Because the ALJ failed to incorporate any of Terrell's alleged limitations into a hypothetical question to the VE and the ALJ failed to properly consider the severity of Terrell's impairments during the relevant time period, the ALJ's reliance on the VE's testimony and Grid Rule 202.13 is misplaced.   Consequently, the ALJ's decision is not supported by substantial evidence.

**III.**    ___Conclusion___

Accordingly, it is therefore

**ORDERED** that Terrell's Motion for Summary Judgment (Docket Entry No. 19) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 21) is **DENIED**.  It finally

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner for a new hearing on the following: development, regarding the onset date and any medically reasonable inferences concerning Terrell's current disabilities, including the review and evaluation by a medical expert; proper consideration, following the development of relevant evidence, of the extent of pain experienced by Terrell and work limitations, if any, such pain imposed on Terrell; and formulation of clear                         t e s t i m o n y from a VE regarding jobs, if any, Terrell was                         c a p a b l e  o f performing considering all of his limitations.

Calvin Botley
United States Magistrate Judge

**SIGNED** at Houston, Texas on this 29th day of March, 2007.

28